### WINN et al. v. MILLER. (No. 11855.)

Court of Civil Appeals of Texas. Fort Worth. Jan. 28, 1928.

Rehearing Denied April 21, 1928. Second Motion for Rehearing Overruled May 19, 1928.

1. **Pleading** ☞9—Ambiguity in contract for sale of corporate stock held question of law which need not be pleaded.

In suit for share in proceeds from sale of corporate stock, ambiguity on face of contract for sale of the stock was question of law to be determined by court, and defendants did not have to plead that conclusion of law in order to rely upon facts specifically pleaded to show what real understanding of parties was.

2. **Evidence** ☞20(1)—It is common knowledge that corporation owning ice plant purchasing competitor in same town usually dismantles latter to save expense.

When corporation owning ice plant bought out its competitor in same town, *held* it was common knowledge that usual course of business was to dismantle purchased plant to save expenses in manufacture of ice.

### On Motion for Rehearing.

3. **Corporations** ☞121(5)—Evidence supported finding that stockholders owning all stock in ice plant agreed to sell at par and prorate proceeds.

In suit by owner of one-fourth of stock in ice plant, sale of which was negotiated by owner of other three-fourths to procure share in proceeds of sale, evidence *held* to support finding that stockholders agreed to sell entire capital stock at par and to prorate proceeds.

4. **Trusts** ☞373—Creation and breach of trust relation between stockholders held fact issue, where one authorized to sell ice plant by resolution of stockholders was sued for share in proceeds.

In suit by owner of one-fourth of stock in ice plant for share in proceeds from sale which was negotiated by owner of other three-fourths, who had been authorized by resolution of stockholders to sell all capital stock, whether trust relation was created and whether it was breached *held* issue of fact.

5. **Corporations** ☞116—Contract providing capital stock was $20,000, three-fourths owned by one stockholder and one-fourth by another, and that stockholder would convey "aforesaid" stock, held sale of entire capital stock.

Contract for sale of stock in ice plant providing that authorized capital stock was $20,-000, three-fourths of which was owned by one stockholder and one-fourth by bank, and that stockholder bound himself to sell "aforesaid" stock in aforesaid corporation for $20,000, *held* as conclusion of law to be sale of entire capital stock.

6. **Evidence** ☞448—Parol evidence of parties' intention could not be given effect over objection, where mutual mistake as to unambiguous contract was pleaded but no proof offered.

Where mutual mistake in making unambiguous contract was pleaded as defense, but no testimony offered to support such defense, parol evidence as to real intention of parties could not be given effect over objection.

7. **Corporations** ☞121(1)—Stockholder could sue on contract for sale of corporate stock for his benefit though not named therein nor furnishing consideration therefor.

Stockholder for whose benefit contract for sale of corporate stock was made could sue thereon though his name was not signed and he paid no consideration therefor.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Appeal from District Court, Young County; G. G. Thornton, Judge.

Suit by S. W. Winn and others against R. R. Miller. From a judgment denying him any relief, the plaintiff appeals. Reversed and remanded for another trial as between all parties.

R. S. Ragsdale, of Burkburnett, G. E. Garner, of Little Rock, Ark., and Weeks, Morrow, Francis & Hankerson, of Wichita Falls, for appellants.

DUNKLIN, J. The Olney Ice Company, doing business in the town of Olney, was incorporated for $20,000. S. W. Winn owned $5,000 and R. R. Miller owned $15,000 of the stock. On February 16, 1926, there was a stockholders' meeting of the Olney Ice Company, at which meeting the following resolution was adopted:

"Olney, Texas.

"Olney Ice Company.

"The stockholders of the Olney Ice Company of Olney, Texas, met in regular session in their office at Olney, Texas, on the third Tuesday, being the 16th day of February, A. D. 1926, all of the stock being represented in said meeting, Mr. R. R. Miller, 150 shares, S. W. Winn, 50 shares.

"Upon motion duly made and seconded, it was unanimously agreed to sell the Olney Ice Plant at par. It was further agreed that Mr. R. R. Miller, president of said company, is to negotiate the sale of said ice plant or the stock of same, at par, and each stockholder is to receive the full proceeds of the sale of his stock from the purchaser.

"The affairs and general conditions of the plant and the present outlook of the business was discussed fully, everything being in a very satisfactory condition. [Signed] R. R. Miller, President and General Manager. [Signed] S. W. Winn, Secretary."

On February 6, 1926, prior to the passage of that resolution, R. R. Miller and M. B. Morgan had executed the following contract:

"State of Texas, County of Young:

"This contract made and entered into this day by and between R. R. Miller of Olney, Texas, party of the first part, and M. B. Morgan, of El Dorado, Arkansas, party of the second party, witnesseth:

"That whereas the Olney Ice Company is a corporation, chartered and organized and existing under the laws of Texas, with an authorized capital stock of twenty thousand ($20,000) dollars, three-fourths (¾) of which is owned by R. R. Miller and one-fourth (¼) is owned or held by the Farmers' State Bank of Burkburnett, Texas, for the consideration hereinafter recited, the said R. R. Miller does hereby contract, agree and bind himself to sell, convey and deliver, and does hereby sell, convey and deliver to M. B. Morgan, party of the second part, the aforesaid stock in the aforesaid corporation, subject to the terms and conditions and for the consideration hereinafter recited;

"That the total consideration for the said stock is to be paid by the purchaser, M. B. Morgan, to the seller, R. R. Miller, is ($20,000)

twenty thousand dollars; ten thousand ($10,-000) dollars cash upon consummation of this contract, and the remaining ten thousand ($10,-000) dollars payable in six and twelve months from date, to be evidenced by two promissory notes in the sum of five thousand ($5,000) dollars each, each bearing 8 per cent. interest per annum from date and payable to R. R. Miller.

"It is further agreed that to secure the payment of the $10,000 and interest, evidenced by said two notes, that the certificates of stock evidencing said three-fourths of the stock of said corporation shall be placed together with said two notes mentioned above in the First National Bank of Olney, Texas, as escrow agent for the parties hereto, and that said stock so escrowed with said notes shall vest in the said M. B. Morgan only when he shall have paid both of said notes and all interest and the expense of collecting same; it being further agreed that if the said Morgan shall not pay said first note when it falls due, that thereupon the said Miller shall have the right to declare both of said notes then due and matured and proceed to foreclose his lien against said stock to enforce the payment of same.

"It is further agreed that until both of said notes shall have been paid as herein provided that the said Morgan, as owner of said three-fourths of the stock in said corporation, does hereby bind himself, and said corporation, to employ and retain the said R. R. Miller as chief engineer of the business of said corporation, under the direction of its general superintendent, at Olney, Texas, at the monthly salary of $160 payable on the 15th and 30th of each month, and the house rent of said Miller, and by said house rent is meant that said Miller is to have the use and occupancy of the house on the property of said corporation so long as he is in the employ of said corporation. This agreement of employment of the said Miller by said corporation is conditioned, and it is further provided that the said Miller is to render efficient, faithful, and satisfactory service as such engineer, and unless he so does that provision of this contract shall thereupon be terminated.

"It is contemplated and understood by the parties hereto that while this contract is signed and said stock is escrowed in said bank this day, said M. B. Morgan shall this day pay into said bank two thousand ($2.000) dollars, and upon payment of said $2.000 this contract and said stock shall be escrowed in said bank together with the two notes of the said M. B. Morgan, subject to the approval of the title to said property of said corporation, that is, lots 9, 10, 11, block 35, Olney Townsite Addition, Olney, Texas, it being understood that the said Miller is to furnish complete abstract, duly certified down to date, and showing good and merchantable title to said property, free from all liens and incumbrances of every kind and free from state, county, municipal and school taxes, and shall also furnish satisfactory proof that all income taxes have been rendered and paid by said corporation. Conditioned that title is satisfactory and marketable as herein provided, then the said Morgan is to pay an additional eight thousand ($8,000) dollars, being the balance of the first ten thousand ($10,000) dollars called for; and conditioned further that if the title is not merchantable and satisfactory, and not made so within the time herein specified,

then this contract shall terminate, whereupon the $2,000 escrowed shall be returned to said Morgan, together with his notes aforesaid, and the stock returned to said Miller. Said abstract to be furnished within three days from date hereof; said Morgan to have three days to examine same and point out in writing any objections or defects, and the said Miller to have five days to cure and remove same. Said Miller to have ten days from this date to show payment of all taxes mentioned herein, this not to vary, however, the time for furnishing abstract, etc. This contract shall in no wise prevent the parties hereto from extending by agreement the date for furnishing abstract, its examination, the curing of defects, and the furnishing of proof of payment of taxes. And should the said Miller fail and refuse to furnish the abstract and cure any defects within the time herein specified such shall not terminate this contract, if at the election of said Morgan, the said Morgan takes an additional ten days and himself does so. And unless the said M. B. Morgan pays the remaining $8,000 into the said bank on or by the 20th day of February, 1926, then this contract shall be at an end, said $2,000 thereupon being forfeited by the said Morgan as liquidated damages for failing to consummate this contract, in which event said stock shall be returned to said R. R. Miller and said $2,000 returned to the said M. B. Morgan; conditioned, however, that if said $8,000 is so paid within said time, then this contract shall become and be enforced thereafter as herein provided.

"This agreement and contract is conditioned, further, that until said two notes have been fully paid, said Morgan and said corporation shall in no wise dismantle, tear down, or destroy any of the property of said corporation, nor shall any changes be made therein except same is of such nature as to enhance and improve said property in value.

"Witness the signatures of the parties hereto on this the 6th day of February, A. D. 1926.

"R. R. Miller.
"M. B. Morgan.

"For a valuable consideration, receipt of which is hereby acknowledged, I hereby transfer stock and assign this contract to Morgan Utilities Inc., it to assume payment hereon. This February 21, 1926.

"M. B. Morgan."

Winn's stock was hypothecated with the Farmers' State Bank of Burkburnett. The contract between Miller and Morgan and the notes called for therein, together with the $10,000 mentioned as a cash consideration, were all placed in escrow in the First National Bank of Olney, Tex., to await the consummation of the sale. On March 9, 1926, the contract of sale was consummated, and by direction of the Morgan Utilities Corporation the bank paid over to Miller the $10,000 mentioned in the contract.

This suit was instituted by S. W. Winn against R. R. Miller, the Morgan Utilities Corporation, and the First National Bank of Olney, to recover one-fourth of the consideration paid and to be paid by the Morgan Utilities Corporation under the contract of sale executed by Miller and Morgan, set out

above; and from a judgment denying him any relief plaintiff has prosecuted this appeal.

According to recitals in the judgment, after a jury was impaneled and the evidence was introduced, plaintiff and defendants each moved for an instructed verdict, both of which motions were overruled. After those motions were overruled, the parties all agreed that the issues of law and fact should all be determined by the trial judge, and the judgment rendered was in accordance with that agreement. The basis of each motion for an instructed verdict was the contention that the contract sued on was unambiguous; the plaintiff contending that according to its terms the contract was for the sale of the entire capital stock of the corporation, and that he, being the owner of one-fourth of the stock, was entitled to recover one-fourth of the consideration to be paid therefor; the contention of the defendants being that the contract, without any ambiguity, showed on its face that the sale was for only three-fourths of the capital stock, which was owned by Miller.

Over objections of the plaintiff, the court admitted parol testimony to determine whether or not it was the understanding and agreement of the parties who executed the contract that the same covered the entire $20,000 capital stock or only the $15,000 owned by Miller. That ruling of the court is made the basis of several assignments of error presented by appellant, presenting the contention (1) that the contract without any ambiguity plainly showed an agreement to sell the entire capital stock, including that owned by Winn, as well as that owned by Miller; and (2) that parol evidence was inadmissible to explain the meaning of the parties for the further reason that the defendants had not pleaded that there was any ambiguity in the contract.

[1] We have reached the conclusion that the contract is not free of ambiguity, and that the court did not err in admitting the parol testimony complained of. While the defendants did not in specific terms plead that the contract was ambiguous, they did allege in substance that it was understood and agreed between the parties thereto that it had reference only to the stock owned by Miller and not the entire stock of $20,000. Whether the contract was ambiguous on its face was a question of law to be determined by the court, and it was unnecessary for defendants to plead that conclusion of law in order to rely upon the facts specifically pleaded to show what the real understanding of the parties was.

The record shows that plaintiff Winn did not learn of the execution of the contract by Miller and Morgan until some time after its consummation and after Miller had received from the escrow bank the $10,000 paid

by the Morgan Utilities Corporation, and that after making that discovery he promptly asserted his claim for one-fourth of the consideration paid by the Morgan Utilities Corporation. The record further showed that the purchaser then informed Miller that it was the understanding of the parties to the contract that the entire capital stock of $20,000 was sold by Miller, while Miller contended that only his three-fourths of the stock was in fact sold. Notwithstanding that contention of the purchaser, evidence was introduced showing that pending the controversy which followed the demand of Winn for one-fourth of the purchase price paid by the Morgan Utilities Corporation, that company offered to buy Winn's stock and pay him therefor $2,500. While the trial judge did not file formal findings of fact and conclusions of law, yet the record does show that in announcing the conclusions reached by him at the time he rendered judgment he had this to say:

"Gentlemen, since the matter is left up to me, I come back to the proposition that there was an agreement made between Mr. Winn and Mr. Miller, that both of them agreed at one time to sell this stock at par value. Then we come to the making of the contract between Mr. Miller and Mr. Morgan, and what their intention was at that time. If that contract had been absolutely unambiguous there would have been no necessity for this lawsuit, in my opinion. Mr. Miller has testified about what his understanding was, and the testimony is that the Morgan Utilities, subsequent to all this contract, this escrow contract, offered $2,500 to Mr. Winn for his 50 shares. It is inconceivable to me that the Morgan Utilities Company claimed that they purchased all of that stock, that they would later come along and offer $2,500 for a one-fourth interest in it. It's absolutely beyond my comprehension. That being true, I find for the defendant, Miller."

It thus appears that the sole basis of the judgment was the conclusion reached that it was the mutual understanding of the parties to the contract that only Miller's $15,000 of stock was sold.

[2] However, in plaintiff's petition the issue of fraud on the part of Miller in making the sale was tendered, and, as noted already, that issue was not determined by the trial court. According to plaintiff's pleadings it was Miller who proposed to Winn that they sell the entire capital stock of the corporation at par, and requested authority so to do, and that the resolution passed at the stockholders' meeting was passed for the purpose of vesting in Miller the authority to sell Winn's stock as well as his own. According to further pleading, Miller concealed from Winn the fact that he had entered into the contract with Morgan and the further fact of its consummation, as above noted. As appears from recitals in the contract, Miller fully protected his own stock from loss by reason of any decision on the part of the purchaser to dismantle the plant, but impliedly consented to such a course so far as Winn's stock was concerned. In this connection, it is to be noted further that the Morgan Utilities Corporation already owned another ice plant in the town of Olney which was a competitor in trade with the Olney Ice Company, and the recitals in the contract indicated a fear on the part of Miller that as soon as the purchaser became the owner of the majority of the stock in the Olney Ice Company, it would likely dismantle that plant to save expenses in the manufacture and sale of ice. And it is a matter of common knowledge that such is the usual course of business under those circumstances. Miller, as president of the corporation, owed the duty to Winn, the minority stockholder, to act fairly with him; and the passage of the stockholders' resolution, which empowered Miller to sell Winn's stock as well as his own, certainly had the effect to create the relation of trust in the matter of sale of the stock as between Winn and Miller.

Even though it should be said that in support of the judgment we should imply a finding by the trial judge adverse to the plea of fraud tendered by the plaintiff, yet the fraud alleged and relied upon by the plaintiff was established by such an overwhelming preponderance of the evidence, if not conclusively established, that we feel impelled to reverse that finding and remand the cause, irrespective of the further finding by the court that it was the understanding of the parties to the contract of sale that only Miller's stock was sold and upon which finding the judgment was based. If Miller perpetrated upon Winn the fraud alleged, the latter would be entitled to recover one-fourth of the proceeds of the sale, regardless of whether the parties to the contract understood it to cover the entire capital stock in the corporation or only three-fourths thereof.

Accordingly, the judgment of the trial court is reversed and the cause is remanded for another trial as between all parties.

### On Motion for Rehearing.

It is true that appellee, Miller, testified that according to his recollection the copy of the resolution of the stockholders' meeeting of the Olney Ice Company, set out in our original opinion, was not an exact copy of the resolution passed at that meeting. However, he did testify that there was such a meeting and a resolution of some kind passed which embodied the agreement between him and Winn and Utts cashier of the Farmers' State Bank of Burkburnett. However, Miller's testimony as to the agreement was substantially the same as embodied in the stockholders' resolution offered, referred to above. In part he testified as follows:

"As near as I can state the language of the agreement, as well as I can remember, was

we agreed to sell our stock at par. That was executed, to the best of my recollection, about the 1st of January. It was before February 6th as regards the execution of the contract with Mr. Morgan; it was before, I think. At any rate I got a paper of some kind. * * * All I remember about the agreement was that I was just authorized to sell the Winn interest. We were in a drug store in Burkburnett when we signed that agreement we were talking about a while ago. * * * As to the conversation between Mr. Utts and myself about the matter, I think we were talking about the plant in general, and I made the remark, I says, 'I have an opportunity to sell out.' He never asked me to who or for how much money; I says, 'We have been sort of dickering along on this thing; I don't know whether it is going to materialize or not.' He says, 'Why not sell our stock too?' I says, 'Well; if they want to buy it I can sell it for you. I don't know how it will turn out, whether these parties will take my word for it or not. You have your stock up here and when they go to buy this stock I think they will want to know who owns it, and whether I can produce it or not.' He says, 'We will give you authority to sell this stock.' I says, 'All right; we'll do that then.' That is the substance of the conversation. That was leading up to the signing of this agreement."

Testifying further relative to the conversation he had with Winn on the occasion when the agreement or resolution was executed, Miller said:

"I testified a while ago· he didn't want his left. That agreement was to sell our stock at par; he didn't want me to take my $15,000 worth of stock and wreck the price of his; I didn't want him to take his $5,000 worth of stock and wreck the price of mine, so we agreed we'd take par for our·stock; it was up to me to get better than par for mine; they had the same privilege. * * * I had already made up my mind and agreed with these gentlemen and taken the power of attorney and agency to sell that stock as par, and yet after I talked to Mr. Morgan I raised the price to $25,000. I did not intend to keep $20,000 and give him $5,000. As to what I intended to give him out of it, I intended to give him his·pro rata of what the stock sale came to."

[3, 4] We adhere to the conclusion reached on original hearing that the pleadings and evidence tended to· show a trust relation between Miller and Winn relative to the sale of Winn's stock; in other words, we believe that the evidence was sufficient to support the finding of an agreement on the part of Miller and Winn to sell the entire capital stock at par and to account to Winn for his pro rata part of that price. We also adhere to the conclusion reached that the pleading was sufficient to present that issue, and that the record clearly shows that the trial court did not determine it, but based his judgment on a separate and distinct theory. If the trust relation was established, and if Miller breached it, then ,his action in so doing was a constructive fraud on Winn, and in our original the term fraud was used in that sense only. Upon another trial of the case the issue of whether or not the trust relation mentioned above was created, and whether or not it was breached by Miller, is an issue to be determined by the jury, or by the trial judge in the absence of a jury, like any other issue of fact. We did not intend to hold nor do not now hold that upon the same evidence heard upon the last trial, the trial court should instruct a verdict in Winn's favor upon these issues if.the next trial is before a jury.

[5] Furthermore, after a more mature consideration of the question, we have reached the conclusion that we were in error in holding that the contract between Miller and the Morgan Utilities Corporation was ambiguous upon its face, and that therefore the court did not err in admitting parol testimony offered by Miller to support his pleadings, to the effect that it was the understanding and intention of the parties to that instrument that only Miller's three-fourths interest in the stock was sold. We are now of the opinion that there was no ambiguity in the contract and that it showed on its face an agreement on the part of Miller to sell all of the capital stock in the Olney Ice Company for a consideration of $20,000. It will be noted that after reciting the fact that the authorized capital stock of the Olney Ice Company was $20,000, three-fourths of which was owned by Miller and one-fourth was owned or held by the Farmers' State Bank of Burkburnett, Miller bound himself to sell and convey to Morgan "the aforesaid stock in the aforesaid corporation." And in the paragraph following is the stipulation that the "total consideration for the said`stock" is the sum of $20,000. Upon the face of the contract we believe that those stipulations should be construed, as a conclusion of law, as having reference to the entire capital stock of the corporation and as binding Miller to sell it for a consideration of $20,000. At the time the contract was executed, Winn's stock was in the Farmers' State Bank, while Miller had possession of his own stock. Other stipulations in the contract that Miller's three-fourths interest in the stock should be deposited in escrow to await the final payment of the consideration, and that until the full consideration was paid Miller was to be employed as the chief engineer of the ice plant, were not inconsistent with and did not render ambiguous Miller's agreement, expressed in the foregoing provision of the contract binding him to sell all of the capital stock for a consideration of $20,000.

[6] While Miller specially pleaded that the failure to embody in the contract the specific stipulation that only his three-fourths interest in the stock was contracted to be sold was due to the mutual mistake of the parties in drafting the instrument, yet no testimony was offered to support that allegation. In

the absence of such proof, and since there was no ambiguity in the contract, parol evidence offered by Miller to show the real intention and agreement of the parties to the contract, all of which was duly objected to by appellants at the time, could not be given any legal effect. Pomeroy's Equity (2d) vol. 5, § 296; Coverdill v. Seymour, 94 Tex. 1, 57 S. W. 37; Reagan v. Bruff, 49 Tex. Civ. App. 226, 108 S. W. 185; Henry v. Phillips, 105 Tex. 459, 151 S. W. 533; Morrison v. Riley (Tex. Civ. App.) 198 S. W. 1032; 2 Williston on Contracts, § 631.

[7] It is a familiar rule that one for whose benefit a contract was made may sue thereon, even though his name be not signed thereto, and even though he paid no consideration therefor. Roberts v. Abney (Tex. Civ. App.) 189 S. W. 1101, and authorities there cited; Simpkins on Contracts, 8397; Southwestern Graphite Co. v. Burnet Nat. Bank (Tex. Civ. App.) 255 S. W. 676.

Accordingly, appellee, Miller's, motion for rehearing is overruled.